MARKMAN, J.
(concurring). I concur with the majority that the test set forth in People v Cress, 468 Mich 678, 692; 664 NW2d 174 (2003), for determining when a new trial is warranted on the grounds of newly-discovered evidence, can be satisfied by impeachment evidence. I further agree that such evidence may be of a general character and need not contradict specific testimony at trial. Rather, it is sufficient that such evidence have an exculpatory and material connection to testimony at trial, and otherwise satisfy the Cress test. Particularly in cases involving one-on-one credibility contests, I believe that the test adopted by the dissent may deprive a defendant of a new trial where newly-discovered evidence does not contradict specific testimony but nonetheless renders a new result probable upon retrial because no crime at all was committed. I also agree that newly-discovered impeachment evidence will only rarely justify the grant of a new trial, that this evidence cannot satisfy Cress if it concerns immaterial or collateral matters, and that it will be the exceptional case in which the necessary “exculpatory connection” to testi *338 mony concerning a material matter will exist and a different result will be probable on retrial. Finally, I agree that it is appropriate to remand this case to the trial court so that it can evaluate defendant’s motion for a new trial in light of our clarified Cress test.
I write separately, however, for two reasons. First, I wish to clarify that I do not join Justice MARILYN KELLY’s concurrence with her own majority opinion for the same reason that I disagree with the dissenting opinion. Contrary to each of these opinions, I find this to be one of the most difficult and puzzling criminal cases that has come before this Court in recent years, and I am considerably less certain than my four colleagues as to how this matter should presently be resolved. I cannot join Justice KELLY’s concurring opinion because, as the dissenting opinion compellingly observes, there is significant existing evidence of defendant’s conduct that suggests guilt. I also cannot join the dissenting opinion because, as Justice KELLY compellingly observes, there is much about the accuser’s conduct that suggests that guilt could never have been established almost exclusively on the basis of the accuser’s testimony had the newly-discovered evidence been available to the jury. As a result, I am satisfied to remand to allow the trial court to assess the entirety of the available evidence in applying the Cress test.
Second, I write separately to summarize both the newly-discovered and the existing evidence that must be considered by the trial court upon remand. The trial court clearly believed that impeachment evidence could never establish the basis for a new trial, and therefore can be said to have abused its discretion as a matter of law. Koon v United States, 518 US 81, 100; 116 S Ct 2035; 135 L Ed 2d 392 (1996). Now that this Court has clarified that such evidence can under the proper circumstances establish such a basis, a remand is appropriate for the trial court’s *339 consideration of Cress. A review of the newly-discovered evidence in this case indicates the following:
—In California, approximately four months after the reported assault at issue in this case (but before the complainant reported that assault), the complainant called her father and told him she had been kidnapped and was being held in a room with no windows. Her father told the police he did not believe the complainant, explaining that he was “afraid it’s just a smoke screen” because complainant “likes to have a lot of attention.” Finally, the complainant’s husband told police that her clothing and toothbrush were missing.
—Police discovered that the complainant was actually in California staying with friends, and that she had told those friends that she had been raped several times, including by her brother in Colorado, and that her husband had been “in on it.”
—When contacted by police, the complainant stated that a man and woman had kidnapped her at knife point, driven her to a concrete block room with no lights or windows, and given her six large, white pills. The complainant stated that the man robbed her of her jewelry.
• — The complainant then recanted her report of the robbery and kidnapping, stating that it “never occurred” and that her friends, whom she had met in an online rape support group 18 months earlier, had picked her up from the restaurant.
—The complainant explained that she had joined the rape support group before being raped in Michigan because “she was raped when she was six years old” and “she has been in and out of support groups and therapy for years.” However, the complainant’s husband expressed “a difficult time believing [she] was telling the truth.”
—The complainant told the police that she had planned to spend the night with her friends without telling her husband or family and had fabricated the kidnapping story to “buy some time” to be alone.
—The complainant then gave a third version of what happened outside the restaurant, one that was strikingly similar to the assault at issue here. The complainant told *340 the police that she never went in the restaurant; instead, a man grabbed her, put a knife to her back, and assaulted and raped her in the restaurant parking lot between two parked cars. The complainant then stated that she went in to the restaurant and had lunch with her family.
—When asked about the complainant’s reported rape in the parking lot of the restaurant, her mother reported that the complainant was never alone in the parking lot of the restaurant. Rather, the complainant had gone in the restaurant with the rest of the family and appeared fine at lunch.
—When the complainant went to the hospital after reporting the rape in the restaurant parking lot, she told the police that the man had inserted a small, hand-held, gray flashlight into her vagina, as well as penetrating her digitally and then with his penis. The complainant said that the man wore a green mask and fled when she began screaming and hitting him. The complainant “had some injuries consistent with a sexual assault.”
—The complainant then told the police that in Colorado she had been raped by her brother’s friend, who had “tracked her down” at her motel. She later recanted this story and denied that any assault had occurred in Colorado.
—The complainant told the fiancé of her friend from the online rape support group that her brother and his friends had gang-raped her 18 months earlier and that they had been convicted. The complainant said that her brother had found her in Colorado after he was released from jail and raped her again and that she thought her husband was also involved.
—The complainant’s friend’s fiancé, a police officer, reported that the complainant had lied to them, that she might be mentally unstable, and that he was worried she might raise false allegations about him.
—As the majority opinion observes, the California police reports “show that complainant reported to police, family or friends that she had been raped by at least eight different people on at least nine separate occasions.”
On remand, the trial court should consider this newly-discovered evidence in conjunction with the evidence, *341 both inculpatory and exculpatory, that was previously offered at trial. This includes at least the following:
—Although the complainant claimed that defendant raped her in a Meijer parking lot during the middle of the day, no witnesses reported seeing or hearing anything at Meijer that day.
—The complainant considerably delayed reporting the alleged sexual assault.
—The complainant provided varying accounts of the alleged assault.
—The physician who examined the complainant after the alleged assault testified that there were other possible explanations than rape for the complainant’s physical injuries.
—The complainant picked a person other than defendant out of a corporeal lineup.
—The complainant claimed that she believed she saw defendant wearing the gold ring he wore during the alleged assault more than a year after defendant had pawned the ring.
—Although the complainant admitted that she knew that DNA evidence could be obtained from clothing, she threw away all the clothing she had worn during the alleged assault.
—Defendant was employed at the store at which the assault allegedly occurred and worked on that date, with his shift beginning shortly after the assault allegedly took place.
—The complainant identified defendant after viewing more than 7,500 photographs.
—The complainant described her attacker as having a skull tattoo on his upper right arm, and defendant had such a tattoo on his upper right arm.
—Defendant lied about owning and pawning a ring that fit the complainant’s description of her attacker’s ring.
—Defendant dramatically altered his appearance shortly before his corporeal lineup.
*342 —Medical and lay testimony reflected that the complainant suffered injuries to her face, shoulder, neck, arms, thighs, and vagina that were consistent with her testimony that she had been sexually assaulted.
When applying the Cress factors to a motion for a new trial, the trial court may consider only two classes of evidence: the claimed newly-discovered evidence and the evidence presented at the previous trial. Any evidence that falls outside these classes is plainly beyond the scope of the Cress process.
Precisely because of the very considerable strengths and the very considerable weaknesses of the evidence arrayed against defendant, this is a case in which a remand is appropriate so that the trial court can properly evaluate all of the evidence before rendering a final judgment on whether a new trial is warranted. This is a truly difficult and perplexing case, which makes it even more important that the trial court itself first consider the evidence in light of our clarification of the Cress test.